******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NORCOTT and McDONALD, Js., concurring. Although we fully agree with and join the majority opinion, we write separately to express our profound concerns regarding an issue of substantial public importance that will never be resolved by this court in light of the majority's determination that the imposition of the death penalty is an unconstitutionally excessive and disproportionate punishment. Specifically, we cannot end our state's nearly 400 year struggle with the macabre muck of capital punishment litigation without speaking to the persistent allegations of racial and ethnic discrimination that have permeated the breadth of this state's experience with capital charging and sentencing decisions. We recognize that this particular challenge to our state's capital punishment regime has not been raised or briefed in the present case and, therefore, cannot serve as the basis for the majority's holding today. Nor do we purport to resolve conclusively these allegations.[1] Because they have been a powerful undercurrent running through virtually all of our death penalty jurisprudence, however, we feel compelled to analyze them.

## I

## ALLEGED RACIAL DISPARITIES IN CAPITAL CHARGING AND SENTENCING

The possibility that the death penalty is sought or imposed in a racially discriminatory manner emerged as a matter of scholarly interest beginning in the 1930s, and the first related legal challenges were brought during the civil rights movement of the 1960s. See D. Baldus et al., "Racial Discrimination and the Death Penalty in the Post-*Furman* Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia," 83 Cornell L. Rev. 1638, 1643 (1998). In Connecticut, the issue came to the attention of this court twenty years ago in *State* v. *Cobb*, 234 Conn. 735, 663 A.2d 948 (1995). As the majority today explains, both supporters and opponents of the death penalty have recognized that: (1) there is an inherent tension in the United States Supreme Court's death penalty jurisprudence; and (2) that court's determination that the eighth amendment precludes the states from restricting the discretion of capital juries necessarily means that juries can—and will—choose whether to impose the ultimate sentence or exercise their mercy in seemingly arbitrary ways. In *Cobb*, the defendant, Sedrick Cobb, sought to present for this court's review data purporting to demonstrate that a capital punishment system that leaves so much to the unlimited discretion of jurors and prosecutors inevitably results in charging and sentencing decisions that are not merely arbitrary and capricious, but also impermissibly discriminatory. Id., 737–40.

A divided three to three panel of this court concluded that Cobb's claims should be decided in the context of a habeas corpus proceeding; id., 762–63; although the dissenting justices concluded that, by statute, Cobb's claim that systemic racial disparities rendered his death sentence disproportionate fell within this court's original jurisdiction and could have been resolved by this court in the first instance with the assistance of a special master. Id., 777–78 (*Berdon, J.,* with whom *Norcott* and *Katz, Js.,* join). With respect to the inevitable delays that would result from submitting the question to a habeas trial, the dissenting justices argued that, "if our capital sentencing system is infected with racism, we must expose that ugly truth as soon as possible. The public and other branches of state government, as well as other defendants who face the death penalty, must know the answer now." Id., 776. "When a capital defendant marshals a compelling argument that the death penalty as it is administered in our state is incurably racist," Justice Berdon later cautioned, "we should stop dead in our tracks until we have given the argument our most serious attention." (Internal quotation marks omitted.) *State* v. *Cobb,* 251 Conn. 285, 537, 743 A.2d 1 (1999) (*Berdon, J.,* dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

History has confirmed that the concerns expressed by the dissenting justices in *State* v. *Cobb,* supra, 234 Conn. 776, were well founded. Eight years later, when Richard Reynolds presented similar evidence of systemic racial disparities in the imposition of the death penalty as a challenge to the constitutionality of his sentence, the parties to Cobb's habeas case still had not finished analyzing the data. See *State* v. *Reynolds,* 264 Conn. 1, 232–33, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). At that time, this court consolidated Reynolds' racial disparity claims, along with those of other death row inmates, with Cobb's habeas action. See id., 233. Ten more years passed, during which the state spent millions of dollars on legal fees and expert statistical reports; see J. Lender, "A Big Bill in Death Row Case," Hartford Courant, September 14, 2014, p. B1; before the habeas court finally issued its decision in 2013. See *In re Death Penalty Disparity Claims,* Superior Court, judicial district of Tolland, Docket No. TSR-CV-05-4000632-S (October 11, 2013) (unpublished opinion). During that time, a number of members of this court voiced their concern that our state's capital punishment system appeared to be incurably tainted by racial and ethnic bias. See, e.g., *State* v. *Santiago,* 305 Conn. 101, 324–25, 49 A.3d 566 (2012) (*Harper, J.,* concurring and dissenting); *State* v. *Peeler,* 271 Conn. 338, 466, 857 A.2d 808 (2004) (*Katz, J.,* dissenting), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Breton,* 264 Conn. 327, 447, 824 A.2d 778 (2003) (*Norcott, J.,* dissenting), cert. denied, 540 U.S. 1055, 124 S. Ct.

819, 157 L. Ed. 2d 708 (2003); *State* v. *Webb*, 238 Conn. 389, 557, 680 A.2d 147 (1996) (*Berdon, J.*, dissenting), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000). This court reserved judgment on the question, however, pending the resolution of the habeas case.

Ultimately, though, the habeas court denied the petitioners' claims on purely legal grounds, without ever clearly stating whether it had credited the petitioners' evidence of systemic racial disparities. *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S. That decision is currently on appeal to this court. See *In re Death Penalty Disparity Claims*, Connecticut Supreme Court, Docket No. SC 19252 (filed November 6, 2013). Today, a majority of this court has concluded that our state constitution no longer permits the execution of capital felons. As a result, we anticipate that those individuals who have been sentenced to death in Connecticut will withdraw any pending penalty phase appeals and habeas claims, and move for a correction of their sentences. See Practice Book § 43-22. In any event, today's majority decision seemingly renders the habeas action moot. Accordingly, although that case would have been the more probable opportunity to address the long-standing racial disparity claims, that avenue is no longer available. If the impressive efforts and substantial expenses invested by the state in that case are not to be all for naught, then the issue should be examined now.

We have been reluctant to accept the conclusion that our capital punishment system is incurably infected with racial and ethnic bias, believing—as we still do—that the vast majority of Connecticut's law enforcement officers, prosecutors, judges, and jurors are decent, fair-minded, and dedicated individuals who strive to see that justice is carried out impartially. Abundant historical and statistical evidence, however, now strongly suggests that racial disparities in the capital punishment system exist in Connecticut—as elsewhere—that cannot be accounted for by benign, nonracial factors. Specifically, there is a substantial and growing body of evidence suggesting that decisions as to: (1) which defendants will be charged with capital crimes, (2) whether to seek the death penalty for those defendants, and (3) whether to impose that ultimate punishment, are heavily influenced by the constitutionally impermissible factors of racial and ethnic bias.

We begin our review with the historical evidence. See *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 172 n.22, 957 A.2d 407 (2008) ("the lessons of history and experience are surely the best guide as to when, and with respect to what interests, society is likely to stigmatize individuals as members of an inferior caste" [internal quotation marks omitted]). As the majority notes, a central theme running through Profes-

sor Lawrence B. Goodheart's recently published book is that the long history of the death penalty in Connecticut has exhibited "an unmistakable racial dimension." L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut (2011) p. 50. Capital punishment, Goodheart suggests, invariably has been imposed disproportionately on marginalized and unpopular groups, and in particular on members of ethnic and racial minorities. See id., p. 39. During the colonial period, this meant African-Americans and Native Americans. See id. From the founding of the colonies in the 1630s through the early 1770s, two thirds of those hanged for homicide, infanticide, and rape were people of color, notwithstanding that nonwhites accounted for only 5 percent of the state population. See id., pp. 17, 50, 57, 61. Native Americans in particular were singled out, not only in the frequency with which they were executed, but also in the barbarity of the procedures deployed. Although hanging was the standard practice, for example, New Haven authorities opted instead for decapitation so as to "racially set apart Nepaupuck and Busheage," two Native American participants in the early tribal skirmishes with European settlers. Id., pp. 17–18. A contemporary account of Busheage's execution describes how the "executioner would strike off his head with a falchion [a sword with a curved blade], but he had eight blows at it before he could effect it . . . ." (Internal quotation marks omitted.) Id., p. 18.

Other historians who have studied this time period have reached the same conclusion as Goodheart. Connecticut's former state historian, for instance, has described how "[w]ell established practice saw . . . white men escaping punishment for rape while black men hanged . . . ." C. Collier, "The Common Law and Individual Rights in Connecticut before the Federal Bill of Rights," 76 Conn. B.J. 1, 18 n.40 (2002). Such "discriminations were so deep and pervasive in the culture," Collier explains, "that the variable nature of justice was seldom called into question." Id. William Holdsworth likewise opines that "white prejudice [was likely among the reasons that] Indians bore a disproportionate share of the severest civil and criminal penalties meted out at this time." W. Holdsworth, Law and Society in Colonial Connecticut, 1636–1672 (1974) p. 315 (unpublished doctoral dissertation, Claremont Graduate School).

This "apartheid in the larger society" continued to infect the capital sentencing system in the nineteenth century. L. Goodheart, supra, p. 92. More than one half of those hanged for rape or murder between 1773 and 1827, for example, were Native American, African-American, or of mixed race. See id., pp. 81, 91. Although the complexion of capital punishment shifted during the mid-nineteenth century, the pattern remained the same. Goodheart identifies this period as the "height of ethnocentricism," an era in which a heavy influx of Irish immigrants resulted in widespread "antipapist and

xenophobic sentiment" directed toward the new ethnic underclass. Id., p. 110. Of the men executed in Connecticut between 1828 and 1879, only one half were members of what Goodheart characterizes as the "white, Protestant majority . . . ." Id. The remainder were recent Irish immigrants and, in a few cases, people of color. See id., p. 111.

Recent arrivals to America continued to figure prominently among those executed during the decades bracketing the turn of the twentieth century. See id., p. 133. Remarkably, of the sixty men who were hanged in Connecticut between 1880 and 1929, only fifteen were of domestic nativity, and one quarter of those were of African or Asian descent. See id., pp. 136–38. Following a new wave of immigration from Southern Europe, fully one third of those executed during this period had been born in Italy. See id.

Although the racial and ethnic disparities that Goodheart records were not quite as pronounced in the twentieth century, he indicates that those "executed were, like those before them, on the margins of society." Id., p. 169. For the first time in centuries, the majority of those executed in Connecticut since 1940 have been native born whites. See id., pp. 174, 187. Still, over one half of the men on death row as of 2005, including the present defendant, Eduardo Santiago, were African-American or Hispanic. See id., p. 219.

In total, of the nearly 160 documented executions in Connecticut history, more than one half of those put to death have been either members of racial minorities or low status first generation Americans. See id., pp. 4, 17, 22, 33, 50, 57, 61, 66, 81, 91, 111, 136–38, 170, 174, 187. Since 1693, only black men have been executed for rape in Connecticut, and each for the rape of a white woman. See id., p. 65. Perhaps more telling is that, in almost 400 years, no white person has ever been executed in Connecticut for the murder of a black person. See id., p. 55. Goodheart quotes one abolitionist as commenting that "[a]ny white person of financial means and with friends . . . has little need to fear the imposition of the death penalty." (Internal quotation marks omitted.) Id., p. 183.

Although Goodheart notes that "low-income black men convicted of murdering whites are particularly vulnerable to capital punishment"; id., pp. 4–5; the enduring lesson from his scholarly chronicle is that looking solely at racial disparities actually significantly *understates* the extent to which prejudice may have tainted Connecticut's capital punishment regime. Many, if not most, of the whites executed in this state have been "untouchables" of another sort, whether unpopular recent immigrants or the marginalized, low status, older women who filled the ranks of those executed for witchcraft. See id., pp. 32–33; W. Holdsworth, supra, pp. 393–97. Only one person executed in Connecticut, Michael

Ross, ever graduated from college; L. Goodheart, supra, p. 221; and his execution would not have occurred had Ross not insisted that it proceed by forgoing additional appeal options. On the basis of this undisputed history, Goodheart ultimately concludes that "documentation of bias in the criminal justice system is clear . . . ." Id., p. 4.

We should not, perhaps, be surprised by the results of this new research. As Justice Brennan recounted in his dissent in *McCleskey* v. *Kemp*, 481 U.S. 279, 330, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), Gunnar Myrdal's "epochal study of American race relations," conducted before the end of the second World War, had already revealed the deep taint of race on our nation's criminal justice system. "As long as only Negroes are concerned and no whites are disturbed," Myrdal wrote, "great leniency will be shown in most cases . . . . The sentences for even major crimes are ordinarily reduced when the victim is another Negro. . . . For offenses which involve any actual or potential danger to whites, however, Negroes are punished more severely than whites. . . . On the other hand, it is quite common for a white criminal to be set free if his crime was against a Negro." (Internal quotation marks omitted.) Id., quoting G. Myrdal, An American Dilemma: The Negro Problem and Modern Democracy (Harper & Brothers 1944) pp. 551–53. More than two decades later, a presidential commission likewise concluded that the "death sentence is disproportionately imposed and carried out on the poor, the Negro, and the members of unpopular groups." The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice (1967) p. 143.

These historical accounts of persistent racial disparities in capital sentencing have been borne out, repeatedly, by contemporary statistical evidence both in Connecticut and throughout the United States. In Connecticut, as we have discussed, the issue first reached this court when Cobb proffered government data, derived from both the Criminal Justice Information Services Division of the Federal Bureau of Investigation and the Uniform Crime Reporting Program of the state of Connecticut, evidencing substantial facial disparities in our state's capital sentencing system. See *State* v. *Cobb*, supra, 234 Conn. 766 n.6 (*Berdon, J.*, dissenting). The data indicated that: "(1) since 1973, prosecutors have charged a capital felony pursuant to General Statutes § 53a-54b in seventy-four cases, of which only eleven, or 15 percent, have involved the murder of a victim who was black, even though 40 percent of all murder victims in the state during that same time period were black; (2) since 1973, although there have been eighteen capital prosecutions for murder committed during the course of kidnapping, none was prosecuted where the victim was black; (3) during the same period, there have been twelve capital prose-

cutions for murder committed in the course of a sexual assault, and only one involved the murder of a black victim; (4) since 1973, twenty-eight cases have resulted in a conviction of capital felony, by verdict or plea, and eighteen of those twenty-eight have proceeded to a hearing on the imposition of the death penalty. Of the twenty-eight capital felony convictions, only four, or 14 percent, have involved the murder of a victim who was black, and of the eighteen that have gone to a penalty phase hearing, only one, or 5.5 percent, has involved the murder of a black victim; (5) of the sixty-six capital convictions in which the guilt phase has been concluded, twenty-one involved black defendants and forty-five involved nonblack defendants. Of the black defendants, thirteen of twenty-one, or 62 percent, were convicted of capital felonies and fifteen of forty-five, or 33 percent, [nonblack] defendants were so convicted." Id., 738–39 n.4. In that case, however, both parties, the three prevailing justices, and the three dissenting justices all agreed that Cobb's data were preliminary and that further research and analysis were required before this court could rule on the constitutional import of any systemic racial or ethnic disparities. See id., 739–40 n.4; id., 768 (*Berdon, J.*, dissenting); *State* v. *Breton*, 235 Conn. 206, 264, 663 A.2d 1026 (1995) (*Berdon, J.*, dissenting).

Since that time, substantial new information has become available that provides further support for Cobb's allegations of systemic racial bias. In 2001, the Connecticut legislature created a Commission on the Death Penalty (commission) "to study the imposition of the death penalty in this state." Public Acts 2001, No. 01-151, § 4 (a) (P.A. 01-151). Public Act 01-151 mandated that the new commission examine and report on fourteen aspects of Connecticut's capital punishment scheme. See P.A. 01-151, § 4 (c) and (d). One requirement was that the commission study whether "there is any disparity in the decision to charge, prosecute and sentence a person for a capital felony based on the race, ethnicity, gender, religion, sexual orientation, age or socioeconomic status of the defendant or the victim . . . ." P.A. 01-151, § 4 (c) (3).

The commission issued its final report in January, 2003, in which it indicated that it had performed a comprehensive review of all 166 capital felony prosecutions in Connecticut since 1973. See State of Connecticut, Commission on the Death Penalty, Study Pursuant to Public Act No. 01-151 of the Imposition of the Death Penalty in Connecticut (January 8, 2003) pp. 17, 21 (Commission Report).[2] The Commission Report found, among other things, that murders involving non-Hispanic white victims represented just over one half of the capital prosecutions in the state, but accounted for 86 percent of the death sentences imposed. See id., pp. 21, 25. By contrast, the thirty-eight offenders accused of murdering African-American victims accounted for

nearly one fourth of all capital felony prosecutions, but not one of the offenders was sentenced to death. See id., pp. 22, 24. Taken together, crimes involving African-American or Hispanic victims accounted for 40 percent of all convictions, but just 14 percent of death sentences. See id., p. 25. Because of these disparities, the commission recommended that "Connecticut should adopt legislation explicitly providing that no person shall be put to death in accordance with any death sentence sought or imposed based on the race . . . of the defendant. To enforce such a law, Connecticut should permit defendants to establish prima facie cases of discrimination based upon proof that their sentence is part of an established discriminatory pattern." Id., p. 28. The commission further recognized that numerous studies conducted in other jurisdictions, after subjecting similar findings to multivariate statistical analysis, have concluded that "race is a factor that influences the outcome of capital cases." Id., p. 18.

Accordingly, data from three authoritative governmental sources—the Criminal Justice Information Services Division of the Federal Bureau of Investigation, the Uniform Crime Reporting Program of the state of Connecticut, and the Commission Report—all suggest that the death penalty in Connecticut continues to be imposed disproportionately based on the race and ethnicity of the offender and the victim. The alleged disparities are significant, and hold across hundreds of cases. We are not aware of any study or report to have reached a contrary conclusion. In fact, the chief state's attorney, who represents the state in this matter, now concedes that there are "obvious" facial disparities in Connecticut's capital punishment system. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2650–51, remarks of Chief State's Attorney Kevin Kane (When Kane was asked about raw data indicating that minority defendants who commit capital eligible murders of white victims are far more likely to receive the death sentence than those who murder minority victims, he responded: "We've seen disparity. It's obvious.").[3]

We are not aware of any innocuous, nonracial factors that would plausibly account for these undisputed disparities in capital charging and sentencing rates. Rather, the available evidence supports the conclusion that, when members of minority groups who offend against whites are charged with capital crimes and subjected to execution at far greater rates than other defendants who commit comparable crimes, those disparities are a result of racial biases and cannot be explained away by other, innocuous factors.

Goodheart has reviewed, from a historical standpoint, four centuries of commentaries, death day sermons, press reports, and public records regarding the imposition of the death penalty in Connecticut. On the

basis of that review, he concludes that persistent racial disparities in our state's capital punishment system are the product of "ethnocentricism," "xenophobic sentiment"; L. Goodheart, supra, p. 110; and racial "apartheid . . . ." Id., p. 92. To put it most plainly, Goodheart reports, "Yankee observers regularly characterized executed immigrants as subhuman." Id., p. 162.

Significantly, this court has long taken judicial notice of the fact that disparate sentencing outcomes can be the result of subtle racial biases: "We cannot be blind to the fact that there may still be some who are biased against the Negro race and would be more easily convinced of a Negro's guilt of the crime of rape than they would of a white man's guilt. Especially would they be unlikely to approach in a detached and objective manner the decision of the guilt or innocence of a Negro charged with raping a white woman." *State* v. *Higgs*, 143 Conn. 138, 143, 120 A.2d 152 (1956).

During the legislative hearings on No. 12-5 of the 2012 Public Acts (P.A. 12-5), multiple witnesses testified that, one-half century later, Connecticut's capital punishment system remains far from color-blind.[4] Their testimony finds support in abundant sociological research from other jurisdictions, much of it published subsequent to our decision in *State* v. *Cobb*, supra, 234 Conn. 735, linking current racial disparities in the administration of the death penalty to our country's history of racism. "[N]umerous studies conducted in the United States since the [United States] Supreme Court decided *Furman* v. *Georgia* [408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] . . . suggest that, when significant non-racial factors are accounted for, race is a factor that influences the outcome of capital cases." Commission Report, supra, pp. 17–18. In 1990, for example, the United States General Accounting Office "reported to the Senate and House Committees on the Judiciary that its synthesis of [twenty-eight] studies on the subject disclosed a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision. . . . In 82 percent of the studies, [the] race of [the] victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks." (Footnote omitted; internal quotation marks omitted.) Id., p. 18, citing United States General Accounting Office, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities (February 1990) p. 5. "This finding was remarkably consistent across data sets, states, data collection methods, and analytic techniques." United States General Accounting Office, supra, p. 5.

The conclusion of the United States General Accounting Office, which was based on various types of statisti-

cal analysis, has since been confirmed in fifteen additional studies conducted during the 1990s, and many more published since 2000. *Evans* v. *State*, 396 Md. 256, 314, 914 A.2d 25 (2006), cert. denied, 552 U.S. 835, 128 S. Ct. 65, 169 L. Ed. 2d 53 (2007); see, e.g., C. Steiker & J. Steiker, Report to the American Law Institute Concerning Capital Punishment, in A.L.I., Report of the Council to the Membership of The American Law Institute On the Matter of the Death Penalty (April 15, 2009) annex B, p. 14 (reporting that many researchers in many different jurisdictions continue to find "strong racial effects"); D. Baldus et al., supra, 83 Cornell L. Rev. 1661 (finding evidence of race of victim disparities in 90 percent of states studied and of race of defendant disparities in 55 percent); K. Barnes et al., "Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases," 51 Ariz. L. Rev. 305, 338 (2009) (finding large racial disparity in conviction rate in Missouri); K. Beckett & H. Evans, The Role of Race in Washington State Capital Sentencing, 1981–2012 (January 27, 2014) p. 2 ("regression analyses indicate that juries were three times more likely to impose a sentence of death when the defendant was black than in cases involving similarly situated white defendants" [emphasis omitted]), available at http://www.death penaltyinfo.org/documents/WashRaceStudy2014.pd-f(last visited July 8, 2015); J. Blume et al., "Explaining Death Row's Population and Racial Composition," 1 J. Empirical Legal Stud. 165, 167, 169 (2004) (comprehensive regression analysis of death row populations in thirty-one states over two decades revealed that prosecutorial decision to seek death sentence more aggressively for black defendants who murder white victims results in clear "racial hierarchy"); S. Johnson et al., "The Delaware Death Penalty: An Empirical Study," 97 Iowa L. Rev. 1925, 1939 (2012) (finding "dramatic" racial disparities); J. Levinson et al., "Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States," 89 N.Y.U. L. Rev. 513, 521 (2014) (finding that death qualified jurors harbor stronger implicit racial biases than excluded jurors); Maryland Commission on Capital Punishment, Final Report to the General Assembly (December 12, 2008) pp. 9–10 (recommending abolition of capital punishment based in part on nearly unanimous finding by commissioners that "the troublesome factor of race plays a dominant role in the administration of the death penalty in Maryland"), available at http://www.goccp. maryland.gov/capital-punishment/documents/death-penalty-commission-final-report.pdf (last visited July 8, 2015); G. Pierce & M. Radelet, "The Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides, 1990–1999," 46 Santa Clara L. Rev. 1, 19 (2005) (finding "glaring differences in the rate of death sentences across categories of victim race/ethnicity"); C. Slobogin, "The Death Penalty in Florida," 1 Elon L. Rev. 17, 54 (2009) ("[n]umerous studies of the

Florida capital punishment process, spanning the past thirty-five years, have confirmed a correlation between the imposition of a death sentence and the race of the murder victim"); M. Wilson, "The Application of the Death Penalty in New Mexico, July 1979 through December 2007: An Empirical Analysis," 38 N.M. L. Rev. 255, 260 (2008) ("data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die"); see generally D. Baldus & G. Woodworth, "Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research," 39 Crim. L. Bull. 194, 196, 207–208 (2003) (finding consistent pattern of race of victim disparities, even after adjusting for culpability of offenders and aggravation level of crimes); J. Sorensen et al., "Empirical Studies on Race and Death Penalty Sentencing: A Decade After the GAO Report," 37 Crim. L. Bull. 395, 403–404 (2001) (in meta-analysis of "high quality" statistical studies, race of victim disparities in capital charging decision found in 90 percent of studies after adjusting for control variables).

All of the meta-analyses[5] cited herein, and all of the major, multijurisdictional primary studies, have concluded, after subjecting evidence of racial disparities to advanced multivariate statistical analysis, that offenders who murder non-Hispanic white victims are more likely to be charged with a capital offense and/or sentenced to death than those who victimize members of racial minorities. See D. Baldus et al., supra, 83 Cornell L. Rev. 1659; D. Baldus & G. Woodworth, supra, 39 Crim. L. Bull. 214; J. Blume et al., supra, 1 J. Empirical Legal Stud. 167; J. Sorensen et al., supra, 37 Crim. L. Bull. 403; United States General Accounting Office, supra, p. 5. Some of the studies also have identified a race of offender bias. The report by the United States General Accounting Office was the result of a significant and nonpartisan research effort on the part of the federal government. The other cited studies are authored by respected and, in some cases, nationally renowned experts in the field. We are not aware of any high quality meta-analysis or multijurisdictional study to have reached a contrary conclusion. We have no reason to gainsay such overwhelming evidence of racial bias.

Finally, since this court last considered the constitutionality of the death penalty, new empirical evidence has emerged that not only supports the allegation of substantial and statistically significant racial disparities in the imposition of the death penalty *in Connecticut*, but also suggests that such disparities are unlikely to be the product of innocuous, nonracial factors. During the hearings on P.A. 12-5, legislators heard extensive testimony from Stanford (and former Yale) Law School Professor John J. Donohue III, a nationally recognized expert in criminal law and econometrics. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9,

2012 Sess., pp. 2786–96, remarks of Professor Donohue. In 2006, the petitioners in the habeas case, *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S, hired Donohue to evaluate data that the Office of the Chief Public Defender had collected relating to every potential capital murder conviction in the state between 1973 and 2007. Employing sophisticated multivariate regression techniques to control for an array of legitimate factors relevant to the capital charging and sentencing decisions, Donohue found substantial racial disparities, especially in prosecutors' decisions to charge particular offenders as capital felons. See J. Donohue, "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?," 11 J. Empirical Legal Stud. 637 (2014).

At the legislative hearings, Donohue supplied legislators with a lengthy executive summary of his research, which concluded that "arbitrariness and discrimination are defining features of the state's capital punishment regime." Conn. Joint Standing Committee Hearings, supra, p. 3001. Specifically, the data revealed that Connecticut's prosecutors have not pursued capital charges solely based on the egregiousness of the crime, but, instead, that racial minorities who kill white victims are charged at a rate sharply higher than for other racial configurations. See id., pp. 3003, 3005–3006. "An essential message from the regression analysis across an array of murder categories [was] that the likelihood that a death-eligible murder will result in a death sentence is at least an order of magnitude higher for minority on white murders . . . ." (Citation omitted.) Id., p. 3006. During the ensuing legislative debates, a number of supporters of P.A. 12-5 expressed that Donohue's research was an important factor in their decision to vote to abolish the death penalty.[6]

Since the time of those legislative hearings, Donohue's research has been published in a well respected peer reviewed academic journal. See J. Donohue, supra, 11 J. Empirical Legal Stud. 637. The article describes how the "overwhelming" racial disparities in capital charging in Connecticut became even more pronounced after controlling for numerous legally relevant variables; id.; including the egregiousness of the crime, "geographic and time indicators, various measures reflecting the aggravating and mitigating aspects of the crime, the nature of the crime that established it as a capital felony, measures of the culpability of the defendant, the suffering of the victim, the number of victims and aspects of the victim's circumstances, indic[a]tors of whether the defendant had killed a stranger or had prior prison sentences, and various measures of the strength of the evidence . . . ." Id., 682 n.80. Perhaps the most striking finding was that minority defendants who committed capital eligible fel-

onies against white victims in Connecticut were charged with capital crimes in 85 percent of cases, whereas prosecutors only sought a capital conviction approximately 60 percent of the time for crimes with minority victims.[7] See id., 648. Donohue also concluded that there is compelling, statistically significant evidence that minority defendants who kill whites are substantially more likely to receive a sentence of death than white defendants who commit equally egregious crimes. See id., 640, 672–73. A thorough and fair-minded review of the available historical and sociological data thus strongly suggests that systemic racial bias continues to infect the capital punishment system in Connecticut in the post-*Furman* era.

We strongly emphasize that the fact that a charging or sentencing decision may be based in part on impermissible racial factors does not imply that the prosecutor, judge, or juror making that decision is "racist," as that term is typically used. Statistical studies from other jurisdictions have demonstrated that the most likely explanation for such disparities is the tendency of members of the majority race to be more empathetic to majority victims, who resemble themselves, and less sympathetic to minority perpetrators, with whom they are less able to identify. See, e.g., M. Lynch & C. Haney, "Looking across the Empathic Divide: Racialized Decision Making on the Capital Jury," 2011 Mich. St. L. Rev. 573 (2011) (and sources cited therein); see generally The Sentencing Project, "Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies" (2014) pp. 3, 18 (whites' implicit association of people of color with criminality linked to more punitive attitudes). This conclusion is bolstered by recent scientific studies that now document what has long been recognized: most, if not all, of us exhibit unconscious or implicit bias. See, e.g., J. Kang & K. Lane, "Seeing Through Colorblindness: Implicit Bias and the Law," 58 UCLA L. Rev. 465, 473 (2010) ("Implicit biases—by which we mean implicit attitudes and stereotypes—are both pervasive [most individuals show evidence of some biases], and large in magnitude, statistically speaking. In other words, we are not, on average or generally, cognitively colorblind.").

It likely is the case that many, if not most, of the documented disparities in capital charging and sentencing arise not from purposeful, hateful racism or racial animus, but rather from these sorts of subtle, imperceptible biases on the part of generally well-meaning decision makers. Historically, though, it is difficult to refute what Goodheart and others have noted: that, at varying times throughout our history, the lives of Native Americans, African-Americans, Asians, Irish, Italians, Jews, Roman Catholics, and Hispanics simply have not been considered to be as innately valuable as those of the cultural majority. See L. Goodheart, supra, p. 162; see also *Furman* v. *Georgia*, supra, 408 U.S. 245 (Douglas,

J., concurring) (it is cruel and unusual to apply death penalty "selectively to minorities whose numbers are few, who are outcasts of society, and who are unpopular, but whom society is willing to see suffer though it would not countenance general application of the same penalty across the board"); *State* v. *Cobb*, supra, 234 Conn. 768 (*Berdon, J.*, dissenting) ("the inevitable conclusion is that the state places a higher value on the life of a white person than on the life of an African-American"); *District Attorney* v. *Watson*, 381 Mass. 648, 669, 411 N.E.2d 1274 (1980) ("[t]he conclusion is inescapable that the death penalty is reserved for those who kill whites, because the criminal justice system in these states simply does not put the same value on the life of a black person as it does on the life of a white" [internal quotation marks omitted]).

In light of this historical and statistical record, we would be hard-pressed to dismiss or explain away the abundant evidence that suggests the death penalty in Connecticut, as elsewhere, has been and continues to be imposed disproportionately on racial and ethnic minorities, and particularly on those whose victims are members of the white majority. It also appears that such disparities are not primarily the result of benign, nonracial factors. We recognize that, in *McCleskey* v. *Kemp*, supra, 481 U.S. 296–97, the United States Supreme Court concluded that this sort of evidence of systemic racial disparities, taken alone, is insufficient to render the death penalty unconstitutionally arbitrary and discriminatory under the eighth amendment of the federal constitution. We have serious, indeed, grave doubts, however, whether a capital punishment system so tainted by racial and ethnic bias could ever pass muster under our state constitution.

*McCleskey* was a federal habeas case in which the petitioner proffered a statistical study performed by Professors David C. Baldus, Charles Pulaski and George Woodworth, that purported to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant. See id., 286. After subjecting their data to an extensive regression analysis, taking account of 230 variables that could have explained these disparities on nonracial grounds, the professors concluded, among other things, that defendants in Georgia charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks. See id., 287.

On a five to four vote, a narrow majority of the United States Supreme Court rejected the petitioner's claim. The majority assumed the validity of the petitioner's statistical study, but held that such evidence of persistent racial disparities in capital charging and sentencing is insufficient to invalidate a death sentence under the federal eighth amendment; id., 308; or equal protection

clause. Id., 297–99. Rather, the majority indicated, to demonstrate a constitutional violation the petitioner would have to prove that purposeful, "invidious" discrimination played a role in his particular sentencing decision. See id., 312–13.

That requirement places upon each individual seeking to demonstrate a constitutional violation a Herculean task. As Justice Harper explained in his dissent in *State* v. *Santiago*, supra, 305 Conn. 327: "It is incredibly difficult—bordering on impossible—to demonstrate prohibited animus behind the decision to charge an individual with capital felony, behind the refusal to accept a plea to a lesser penalty, behind the jury's decision to convict or behind the jury's decision to select one of its fellow human beings for death. . . . It is not, however, the rare case, where at least one of these decisions—even if unconsciously—is influenced by considerations of the race of the defendant, the victim, or both." (Footnote omitted.) See also J. Sullivan, "The Abyss of Racism," 13 J. App. Prac. & Process 91, 97 (2012) ("proving discrimination in the individual case is virtually impossible unless the prosecutor is prepared to admit bias").

Perhaps unsurprisingly, the holding in *McCleskey* has been roundly criticized. See K. Williams, "Deregulation of the Death Penalty," 40 Santa Clara L. Rev. 677, 708 and n.219 (2000) (collecting sources). The court itself in *McCleskey* was in strong disagreement, and Justice Brennan, with whom Justices Blackmun, Marshall, and Stevens joined, argued in his dissent that the operative constitutional question ought to be whether "sentencing procedures . . . create a *substantial risk* that the punishment will be inflicted in an arbitrary and capricious manner." (Emphasis added.) *McCleskey* v. *Kemp*, supra, 481 U.S. 322. "This emphasis on risk," Justice Brennan further explained in his dissent, "acknowledges the difficulty of divining the jury's motivation in an individual case. In addition, it reflects the fact that concern for arbitrariness focuses on the rationality of the system as a whole, and that a system that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational." Id., 323.

Especially noteworthy is the fact that the author of the *majority* opinion in *McCleskey*, Justice Powell, later confided to his biographer that if he could change his vote in any one case, it would be *McCleskey*. See J. Jeffries, Justice Lewis F. Powell, Jr. (2001 Ed.) p. 451; see also *State* v. *Ross*, 230 Conn. 183, 315–16, 646 A.2d 1318 (1994) (*Berdon, J.*, dissenting in part), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). One legal scholar explained Justice Powell's renunciation of his pivotal role in the *McCleskey* decision this way: "If one is known by the company that one keeps, Justice Powell no doubt wished for far better company

for one of his final decisions, *McCleskey* v. *Kemp* [supra, 481 U.S. 279]. After the opinion's release, legal and lay commentators quickly compared *McCleskey* to infamous decisions like *Dred Scott*,[8] *Korematsu*,[9] and *Plessy*.[10] And a quarter of a century later, *McCleskey* has become firmly entrenched as a resident in the exclusive but not so desirable neighborhood of Notorious Cases . . . . Especially in the criminal law area, a legal scholar can invoke *McCleskey* confident that the reader will understand that the case is being used as shorthand for 'cases in which the Supreme Court failed the [c]onstitution's most basic values.' " (Footnotes altered.) S. Sundby, "The Loss of Constitutional Faith: *McCleskey* v. *Kemp* and the Dark Side of Procedure," 10 Ohio St. J. Crim. L. 5 (2012).

In light of these criticisms, the Massachusetts Supreme Judicial Court declined to adopt the standard set forth in *McCleskey* and instead held that the death penalty offends that state's constitution insofar as pervasive racial disparities in capital charging or sentencing can be documented. See *District Attorney* v. *Watson*, supra, 381 Mass. 665. Because "experience has shown that the death penalty will fall discriminatorily upon minorities, particularly blacks," that court concluded that the death penalty is unconstitutionally cruel under article twenty-six of the Massachusetts Declaration of Rights. Id.

Although the standard set forth in *McCleskey* may be appropriate for challenges to noncapital sentencing determinations, we question whether it provides adequate protection when the ultimate punishment of death is involved. Cf. *Hall* v. *Florida*,      U.S.      , 134 S. Ct. 1986, 1993, 188 L. Ed. 2d 1007 (2014) (intellectually disabled defendants are subject to ordinary criminal responsibility but may not receive "law's most severe sentence"). The types of subtle biases that influence members of the majority to make decisions favoring their own race may well be inevitable, albeit regrettable. When unconsciously made, they do not inherently impugn the diligent and good faith work of our prosecutors, police, judges, and jurors. Nor do they mean that the outcomes of a criminal justice system, writ large, are manifestly unjust. See *District Attorney* v. *Watson*, supra, 381 Mass. 668. But both this court and the United States Supreme Court repeatedly have made clear that "[d]eath is different."[11] Because a sentence of death is uniquely irreversible and deprives the condemned of the ability to exercise *any* of his inalienable rights; see *Furman* v. *Georgia*, supra, 408 U.S. 290 (Brennan, J., concurring); it ought not be imposed unless we are assured that the selection between a sentence of death or life imprisonment is based solely on objective, morally defensible criteria. The fact that a white prosecutor or a white juror may be more troubled by the death of a white victim than of a black or Hispanic victim may be psychologically explicable, but it is not morally

defensible. It should not be the basis on which we decide who lives and who dies. See *District Attorney* v. *Watson*, supra, 668.

The death penalty is fundamentally different from other punishments for which we may, reluctantly, have to tolerate some degree of unintentional systemic disparity or imperfection. Execution represents a complete and utter rejection of the personhood and humanity of the condemned, an irreversible banishment from the moral community. "The death sentence itself is a declaration that society deems the prisoner a nullity, less than human and unworthy to live." Id., 683 (Liacos, J., concurring). Execution cuts off any possibility of rehabilitation, or redemption, or hope. As Justice Douglas observed in his concurrence in *Furman*, in a nation "committed to equal protection of the laws there is no permissible caste aspect of law enforcement. . . . In ancient Hindu law a Brahman was exempt from capital punishment, and . . . punishment increased in severity as social status diminished. We have, I fear, taken in practice the same position . . . ." (Footnotes omitted; internal quotation marks omitted.) *Furman* v. *Georgia*, supra, 408 U.S. 255. We doubt that our state constitution would permit us, however inadvertently, to tip the scales of death toward those whom society values less.

For the same reasons, we are not persuaded by the argument that there is neither a legal nor a moral problem so long as all those sentenced to death in Connecticut over the past one-half century have been legitimately charged with and convicted of heinous capital crimes. If this is the case, the argument goes, then the fact that the racial statistics appear to be skewed in favor of whites is immaterial, because each man on death row has been found guilty by a jury of his peers, as provided by law. Any such argument entirely misses the point.

It may be that every black man ever executed for raping a white woman and every Native American ever executed for murdering a white man in Connecticut was guilty as charged, and received his due process and his proper punishment under the laws then in effect. But white men in Connecticut have also killed Native Americans over the past 400 years, and raped black women. None has ever hanged for it. To the extent that a criminal justice system operates such that only racial minorities are subject to execution for their participation in interracial crimes, the fact that those executed are guilty as charged is of little succor.[12] To the extent that such biases, however subconscious, invariably continue to influence who is charged with and sentenced to the ultimate punishment, the death penalty likely would be hard put to survive constitutional scrutiny.

The offense committed by the defendant was, like all murders, a terrible and tragic crime. But some could rightly question whether it was among the "worst of

the worst" for which the ultimate punishment must be reserved.[13] The defendant shot the victim in his sleep, for limited pecuniary gain; if he had killed the victim in precisely the same manner, but merely as a favor to his friend, he would not be eligible for the death penalty. The defendant is Hispanic, and his victim was white. In light of the available data, we simply cannot be assured that, had their races been reversed, the outcome would have been the same. Nor do we have much confidence that, despite significant social progress, we are close to the day when capital punishment may be imposed in a color-blind and ethnically neutral manner. Lacking such assurances, we would find the prospect of any future executions in this state deeply troubling and suspect.

## II

### RESPONSE TO THE DISSENTING OPINION OF CHIEF JUSTICE ROGERS

#### A

##### The Chief Justice's Concerns with the Objectivity of This Concurrence

In her dissenting opinion, Chief Justice Rogers contends that we have "cherry picked" the research on which we rely herein. This is a bold assertion, and one to which we feel compelled to respond. The Chief Justice challenges both the general objectivity of our review and, specifically, our reliance on Professor Donohue as a source. We consider each volley in turn.

With respect to our review of the social science research governing racial and ethnic disparities in capital charging and sentencing, the Chief Justice contends that we have ignored contrary research by Attorney Kent S. Scheidegger, who has also submitted a brief in this appeal on behalf of the amicus Criminal Justice Legal Foundation, purporting to show that " 'claimed racial disparities would shrink to insignificance if legitimate factors, including jurisdiction, could properly be taken into account . . . .' " Chief Justice Rogers also contends that the science underlying this type of research is too complex for a member of this court to understand or assess. See footnote 44 of Chief Justice Rogers' dissenting opinion.

Although much could be said in response, the crux of the problem, we suspect, is that the Chief Justice simply fails to understand the nature or purpose of a meta-analysis. Whether the topic of research is the environmental impacts of a certain contaminant or the health benefits of a morning jog, there will, invariably, be conflicting studies, the results of which may point in different directions. It is true that a layperson, faced with two or more conflicting scientific research studies, may be ill equipped to judge between them. When a meta-analysis has been completed, the simple fact is that we don't have to: someone who *does* understand

the underlying science and statistical methodologies has done it for us. In a meta-analysis, an expert in the field reviews *all* of the available research on a topic. He or she assesses that research both quantitatively (counting up the number of data points and the number of studies pointing in each direction) and qualitatively (assessing the methodological soundness of each study). After assessing the *entire* field of study, the author of the meta-analysis then determines whether any firm conclusions can be drawn from all of the research. See generally J. Blumenthal, "Meta-Analysis: A Primer for Legal Scholars," 80 Temp. L. Rev. 201, 202–14 (2007).

In the present case, Chief Justice Rogers, in highlighting a handful of studies that obtained conflicting results, simply ignores the fact that multiple meta-analyses and multijurisdictional studies conducted by respected scholars and government agencies all have concluded, after reviewing both those primary studies purporting to find a racial effect *and those that did not*, that it is more likely than not that there are racial disparities in capital charging or sentencing. See, e.g., J. Sorensen, supra, 37 Crim. L. Bull. 403–404 (in meta-analysis of "high quality" statistical studies, race of victim disparities in capital charging decision found in 90 percent of studies after adjusting for control variables); United States General Accounting Office, supra, p. 5 (finding race of victim effect on capital charging in 82 percent of studies, and across all methodologies). If there has been any cherry picking, then, it has been on the part of the Chief Justice. We invite her to reach at random into the bag of meta-analyses on racial disparity research and see if she does not draw forth the bounty of fruit that we have found therein.

We next consider Chief Justice Rogers' concerns with our analysis of Donohue's recent report in the Journal of Empirical Legal Studies. See J. Donohue, supra, 11 J. Empirical Legal Stud. 637. We emphasize at the outset that we have not relied herein on the legal analysis that Donohue presents in part VI of that article, in which he takes issue with the decision of the habeas court in *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S. See J. Donohue, supra, pp. 679–93. Rather, our focus and concern have been exclusively with the first five parts of the article, in which Donohue documents how, after accounting for dozens of potential explanatory variables, there continue to be racial disparities in Connecticut's capital punishment system that cannot be attributed to innocuous, nonracial factors. See id., pp. 641–79.

The Chief Justice remains unpersuaded, apparently because the opposing party in the habeas case—the state, via its expert—has, not surprisingly, contested Donohue's findings. Once again, we reject the Chief

Justice's view that this court must be paralyzed by a lack of scientific unanimity, and that we can take notice only of empirical research that is either undisputed or "self-evidently true . . . ." There is no such requirement. The legislative facts on which appellate judges necessarily rely are, in practice, rarely indisputable; see 2 K. Broun, McCormick on Evidence (7th Ed. 2013) § 331, p. 614; and "the fact that we must always act without the illumination of complete knowledge cannot induce paralysis when we confront what is literally an issue of life and death." (Internal quotation marks omitted.) *State* v. *Cobb*, supra, 234 Conn. 780 (*Berdon, J.*, dissenting).

Lastly, just as the Chief Justice has failed to recognize the significance of meta-analysis research, there is no indication that she has accounted for the truth filtering value of the peer review process. "[Peer review] is the process of subjecting an author's scholarly work to the examination of academic experts (scholarly or scientific peers) in the same field." Columbia University Libraries, "What is Peer Review?," available at http://library.columbia.edu/help/faq/workshops/peer review.html (last visited July 22, 2015). Also known as "refereeing," peer_review "is a well-accepted indicator of quality scholarship." Id. Donohue's research, unlike that on which the Chief Justice relies, has been published in a well respected peer reviewed journal and, therefore, has withstood the scrutiny of experts in the field of empirical legal research. Ultimately, then, the Chief Justice is simply incorrect in assuming that we can place no credence in Donohue's conclusions merely because they have been questioned by opposing litigants and amici. Rather, as this court recognized in *State* v. *Porter*, 241 Conn. 57, 91–92, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), lay judges are routinely called upon to evaluate the admissibility of complex and arcane research such as this, with the aid of objective indicia of reliability. See id. ("nonscientists can understand the fundamental characteristics that separate valid science from pale imitations" [internal quotation marks omitted]).

Meta-analysis and peer review are precisely the sorts of objective indicia of scholarship quality and methodological validity upon which judges can and should rely in separating the scientific wheat from the biased chaff. Although we reach no firm conclusions herein as to the existence of racial disparities in Connecticut's capital punishment system, we remain confident that we have identified the best available scholarship in that regard.

B

The Chief Justice's Concerns with the Propriety of This Concurrence

We find it curious that the Chief Justice, despite our

clear statements to the contrary, persists in proclaiming that we have *concluded* that our state's death penalty is imposed in an unconstitutionally discriminatory fashion. We have not. Our goals in this concurring opinion, rather, have been modest and few. First, we would gather, all in one place, the various charges of death penalty racial and ethnic disparity that have been made over the years, and inter with them the most recent and respectable research as to the history, scope, and origin of those alleged disparities. Second, we would express to our sister courts, for whom the issue is not yet a dead letter, our suggestion that they consider closely whether the legal standard articulated in *McCleskey* v. *Kemp*, supra, 481 U.S. 296–97, affords adequate protection to members of minority populations who may face the ultimate punishment. Third, and finally, we would make known to those who, for four centuries, have protested against these alleged disparities that their voices have not gone unheard. We seek to accomplish no more.

We also find curious the suggestion by the Chief Justice that, merely by discussing an issue that today's majority opinion has rendered moot, we somehow have "undermine[d] the institutional integrity of this court . . . ." Those are strong words indeed, particularly in light of the fact that the Chief Justice herself has in the past authored concurring opinions to address issues not before the court. See, e.g., *State* v. *Johnson*, 312 Conn. 687, 706–707, 94 A.3d 1173 (2014) (*Rogers*, *C. J.*, concurring) (expressing hope that, when appropriate case presents itself, court will abandon evidentiary rule adopted in *State* v. *Holliman*, 214 Conn. 38, 46, 570 A.2d 680 [1990]). We are aware of no authority, from this court or any other, supporting the Chief Justice's novel rule that the author(s) of a concurring opinion may freely address issues that are likely to arise in future cases, but that we are categorically barred from discussing issues that will not. As we have explained, one of our goals in authoring this concurring opinion has been to highlight the racial disparity issue for consideration by other courts and legislative bodies. That has long been considered a legitimate function of a concurring opinion. See generally R. Blomquist, "Concurrence, Posner-Style: Ten Ways to Look at the Concurring Opinions of Judge Richard A. Posner," 71 Alb. L. Rev. 37, 46, 56–64 (2008). The Chief Justice offers no reason why it should be otherwise.

[1] See part II B of this concurring opinion.

[2] It is well established that this court may take notice of statistical reports compiled pursuant to legislative mandate. See *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 769 n.28, 12 A.3d 817 (2011); *Sheff* v. *O'Neill*, 238 Conn. 1, 38 n.42, 678 A.2d 1267 (1996).

[3] Given the context of the question to which Kane was responding, Chief Justice Rogers' suggestion that Kane was referring not to disparities in capital punishment, but only in the general prison population, is patently implausible. If that was all Kane intended to say, his response would have been a complete non sequitur to the question posed. It is true, however, that Kane rejected the contention that these disparities are the result of systemic racial bias on the part of prosecutors or juries. See Conn. Joint

Standing Committee Hearings, supra, p. 2652.

[4] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., pp. 812–13, remarks of Senator Donald E. Williams; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2687, remarks of Khalilah Brown Dean, associate professor of political science; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2791, remarks of John J. Donohue III, professor of law; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2691, remarks of Representative Charlie L. Stallworth.

[5] A meta-analysis is a study that reviews all of the available primary research that has been conducted on a subject and evaluates the aggregated findings. See part II A of this concurring opinion.

[6] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., pp. 750–51, remarks of Senator Edwin A. Gomes; id., p. 813, remarks of Senator Donald E. Williams; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2649–55, remarks of Representative Bruce V. Morris; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2516, remarks of Senator Williams; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2691, remarks of Representative Charlie L. Stallworth.

[7] Because the 141 capital felonies charged in Connecticut since 1973 far exceeds the number of death sentences imposed, the former provides a more reliable basis for measuring any systemic racial disparities in the state's capital punishment system. See J. Donohue, supra, 11 J. Empirical Legal Stud. 651.

[8] *Scott* v. *Sanford*, 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1857).

[9] *Korematsu* v. *United States*, 323 U.S. 214, 65 S. Ct. 193, 89 L. Ed. 194 (1944).

[10] *Plessy* v. *Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896).

[11] *State* v. *Rizzo*, 266 Conn. 171, 226, 833 A.2d 363 (2003); see also *California* v. *Ramos*, 463 U.S. 992, 998–99, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983) ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *State* v. *Rizzo*, supra, 226 ("[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two" [internal quotation marks omitted]); *District Attorney* v. *Watson*, supra, 381 Mass. 670 ("[w]hile other forms of punishment may also be arbitrary in some measure, the death penalty requires special scrutiny for constitutionality").

[12] Numerous courts and commentators have recognized that the improper exercise of discretion by government officials tasked with investigating, charging, plea bargaining, and prosecuting crimes is no less offensive to the constitution than discrimination by judges or juries at the fact-finding and sentencing stages of the criminal justice process. See, e.g., *State* v. *Cobb*, supra, 234 Conn. 781 (*Berdon, J.*, dissenting); see also *District Attorney* v. *Watson*, supra, 381 Mass. 667–68 (noting that most life or death decisions in capital punishment process are made prior to trial).

[13] We find noteworthy the fact that the coders whom Donohue employed to objectively assess the egregiousness of the 205 death eligible crimes committed in Connecticut since 1973 determined that 117, or 60 percent, of the offenders who were not sentenced to death committed crimes that were as egregious or more egregious than the crime committed by the defendant. See J. Donohue, supra, 11 J. Empirical Legal Stud. 679. Coders ranked the defendant's crime as the least egregious of those committed by our state's death row inmates. See id.